IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | |
|---|---|
| Verdell Williams, #264383 ) | |
| Petitioner, ) | Civil Action No.8:08-1883-CMC-BHH |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | **OF MAGISTRATE JUDGE** |
| Robert Stevenson, Warden ) | |
| of Broad River Correctional ) | |
| Institution, ) | |
| ) | |
| Respondent. ) | |

The petitioner, a state prisoner, seeks relief pursuant to Title 28, United States Code,
Section 2254. This matter is before the Court on the respondent's motion for summary
judgment. (Dkt. Entry # 15.)

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and
Local Rule 73.02(B)(2)(c), D.S.C., this magistrate judge is authorized to review posttrial
petitions for relief and submit findings and recommendations to the District Court.

The petitioner brought this habeas action on May 12, 2008.[1]  On August 13, 2008,
the respondent moved for summary judgment. By order filed August 14, 2008, pursuant
to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the petitioner was advised of the
summary judgment dismissal procedure and the possible consequences if he failed to
adequately respond to the motion. On September 2, 2008, the petitioner filed a response
opposing the respondent's summary judgment motion.

---

[1]There is not a prison mailroom stamp on the envelope containing the petition.
*Houston v. Lack*, 487 U.S. 266 (1988)(holding document considered filed upon delivery to
prison officials for forwarding to court). Therefore, the undersigned is using the postmark
date as the filing date. (Pet. Attach.)

# I.  PROCEDURAL HISTORY

The petitioner, a state prisoner, is currently incarcerated at the Broad River Correctional Institution.  In February 2000, the Hampton County Grand Jury indicted the petitioner for burglary in the first degree, assault and battery of a high and aggravated nature ("ABHAN"), first degree criminal sexual conduct ("CSC"), and attempted strongarm robbery.  Return Attach. # 7 - App. Pt. 1 at 4.)[2]  Attorneys Stephanie Smart and Steve Plexico represented the petitioner on these charges.  (*Id*. at 1.)  On February 14-15, 2000, the petitioner was tried by a jury with the Honorable J. Ernest Kinard presiding.  (*Id*.)  The jury found him guilty as charged and Judge Kinard sentenced him to fifteen years imprisonment for both the burglary and robbery and ten years for the ABHAN.  (Return Attach. # 7 - App. Pt. 2 at 215.)  The petitioner timely filed a notice of appeal.

Senior Assistant Appellate Defender Wanda H. Haile represented the petitioner on direct appeal.  On November 7, 2001, the petitioner filed a brief with the South Carolina Court of Appeals raising the following issue for review:  The lower court erred in denying appellant's motion for a mistrial on the *Doyle*[3] error committed in the case?  (Return Attach. #1 - Brief of Appellant at 3.)  On September 12, 2002, the South Carolina Court of Appeals affirmed the petitioner's convictions and sentences in an unpublished opinion, *State v. Williams*, 2002-UP-558 (S.C. Ct. App. filed Sept. 12, 2002).  (Return Attach. #10.)

On December 12, 2002, the petitioner filed an application for post-conviction relief ("PCR") raising the following grounds for relief:

> 1.  Attorney Ineffectiveness because trial lawyer did not act in best interest of applicant.

---

[2]The pages cited to in the appendix are to the pagination within the transcript at the bottom of each page as the appendix itself is not Bates stamped.

[3]*Doyle v. Ohio*, 426 U.S. 610 (1976).

2. Attorney failed to throughly investigate particulars of case. Trial lawyer failed to do thorough investigation concerning "identity and footprints."

3. Trial counsel ineffective in not moving before the court for "proper" curative instruction or to "strike" improper comments made by prosecutor, thereby creating a *Doyle* violation;

4. Trial counsel ineffective in not moving before the trial court to have jurors polled.

(Return Attach. # 11- PCR Appl.)  On July 26, 2004, the Honorable John C. Few held a hearing on the matter.  (Return Attach. # 15 - PCR Tr.)  The petitioner was present and represented by attorney Gerald Allen Kelly.  The petitioner testified on his own behalf at the hearing.  On September 13, 2006, Judge Few filed an order denying the petitioner relief and dismissing the application with prejudice.  (Return Attach. # 13 - PCR Order.)  The petitioner timely filed a notice of appeal.

Senior Assistant Appellate Defender Katherine H. Hudgins represented the petitioner on his PCR appeal.  On March 19, 2007, the petitioner filed a petition for a writ of certiorari raising the following issues:

1. Was trial counsel ineffective in failing to move to suppress shoes illegally seized from Williams' mother's home?

2. Did the PCR court err in finding that no prejudice resulted from counsel's deficient performance in failing to object [to] the solicitor's comment on Williams' right to remain silent and failing to object to the solicitor's improper comments during closing argument[?]

(Return Attach. # 3 - Pet. Writ of Cert. 2.)  On March 19, 2008, the South Carolina Supreme Court denied the petitioner a writ of certiorari in an unpublished order.  The remittitur was sent down on April 4, 2008.

The petitioner filed this habeas action raising the following grounds for relief:

**GROUND ONE:** Ineffective assistance of counsel. Trial counsel was ineffective and rendered deficient performance when he failed to object to the solicitor's comment on Petitioner's right to

3

remain silent and failing to object to the solicitor's improper comments during closing arguments.

**GROUND TWO:** Ineffective assistance of counsel. Trial counsel was ineffective in failing to move to suppress shoes illegally seized from Petitioner's mother's home.

**GROUND THREE:** Insufficiency of evidence upon which to support judgment. There is absolutely no credible evidence (circumstantial or otherwise) upon which to support and sustain a judgment of conviction. Thus, Petitioner's [convictions violate] th Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution.

(Pet.)

## II. <u>SUMMARY OF TRIAL TESTIMONY</u>

The victim, an elderly woman living alone, was the first witness for the State. She testified that at 4:00 a.m. on November 13, 1999, while she was in her bed, she heard someone knock on her front door. (Return Attach. # 7 App. Pt. 1 at 33-34; 40.) Without opening the door, she asked the person what he wanted. (*Id.* at 33.) She testified that the person at the door stated that he wanted water to put in his car. (*Id.* at 33; 40.) About ten minutes later, she testified that someone again knocked at the front door asking for tools. (*Id.* at 33.) She told the person that she did not have any tools and returned to her bedroom. (*Id.*) She testified that he went around to the back of her house and she heard someone knocking again. She stated that she went to the back door and yelled through the window asking the person what he wanted. (*Id.*) She testified that he told her to open the door, but she refused. (Return Attach. # 7 App. Pt. 1 at 33-34.) She testified that he repeatedly told her to open the door, but she refused. (*Id.*)

The victim testified that she thought the person was going to break in, so she decided to call 911. (*Id.* at 34.) She stated that as she was on the phone with 911 giving information, a man appeared in her bedroom. (*Id.*) She testified that he grabbed the phone, threw her to the bed, and began fumbling to get her long robe and nightgown up.

4

(*Id*. at 35; 42.)  She testified that she pleaded with him to stop.  (Return Attach. # 7 App. Pt. 1 at 35.)  She testified that he did stop and he then demanded $20.00.  (*Id*.)  She told him she did not have $20.00 and he left.  (*Id*.)  She testified that she did not get a good look at the face of her attacker, but she described him as a tall, dark-skinned black man.  (*Id*. at 36; 42.)

Officer Chassereau was the first officer to arrive at the victim's house.  (Return Attach. # 7 - App. Pt. 1 at 55.)  He testified that he found the back window open and the back door unlocked.  (*Id*. at 58.)  He testified that after securing the area, he dusted for fingerprints, but they were smeared and non-legible.  (*Id*. at. 58-59; 62.)  He stated that a bloodhound was called in and the dog began to track a trail starting at the front door and continuing around the house to the window and then to the street.  (Return Attach. # 7 App. Pt. 1 at 63.)  He testified that after the dog left, he found a footprint in a sandy spot in the carport area of the house next door to the victim's house.  (*Id*. at 59.)  He testified that the dew was extremely heavy and he could see footprints leading from the back of the house to the sandy area.  (*Id*. at 65.)  He testified that when the bloodhound returned, it started tracking again beginning at the back door and running to the sandy spot where the footprint was located and then left going through the woods to the petitioner's house.  (*Id*. at 60; 66.)  Chassereau testified that he and another officer made a cast of the footprint.  (*Id*. at 52; 58-60.)  Chassereau also testified that he had seen the petitioner at the Rose Bowl Café at 3:10 a.m. that morning.  (*Id*.  at  67.)

Jordan Jinks, an officer for the Sheriff's Department, also testified about seizing the petitioner's shoes.  He testified that when he arrived a the petitioner's parents' house, the petitioner's mother told the officers, "whatever [they] needed to do, [they] could do." (Return Attach. # 7 App. Pt. 1 at 70.)  He testified that he found the shoes under the kitchen table.  (*Id*. at 69-70.)  He testified he seized the shoes and approximately 30-45 minutes later, he

5

gave the shoes to Officer Mixson. (*Id*. at 68-70.)  Jinks testified that the shoes were wet and had sand on them. (*Id*. at 72; 75.)

Ted Shealy, a SLED agent, testified that he compared the shoes to the plaster cast of the footprint and he concluded that the shoes were consistent in "size, shape, and outsole design" with the footprint. (Return Attach. # 7 App. Pt. 1 at 83.)

Detective Russell, a certified dog handler, testified that he was the second police officer on the scene. (*Id*. at 111.)  He testified that he made sure the victim was okay and set up a perimeter before he left to pick up the bloodhound in Hampton. (*Id*. at 114.)  He testified that he took the bloodhound, Bubba, to the front porch of the house, where the dog struck a scent and tracked to the back window and then to the petitioner's home. (*Id*. at 90; 97; 100.)[4]  Russell testified that Bubba had the ability to track trails that were up to twenty-nine hours old.  Russell testified that in following this trail, Bubba barked the entire time on the trail. (*Id*. at 88-91. )  He testified that this indicated to him that the trail was less than two hours old.  Russell testified that he then took the dog back to the rear of the victim's house. (Return Attach. # 7 App. Pt. 1 at 114.)  He testified that Bubba tracked to the footprint and then went back to the petitioner's home again. (*Id*. at 91-93; 98; 102-104; 115.)  Russell testified that Sgt. Solomon knew the petitioner and his family. (*Id*. 123.)   Russell also testified that he did not see any footprints in the dew leading away from the victim's house. (*Id*. at 112-113.)

Chauncy Solomon who was working for the Estelle Police Department when this crime was committed also testified. (Return Attach. # 7 App. Pt. 1 at 124.)  He testified that

---

[4]Russell initially testified that on the first trail, the dog went from the front porch around the side of the victim's house to the back door and back window and then on to the petitioner's house. (Return Attach. # 7 App. Pt. 1 at 90.) Subsequently, he testified that the dog went from the front porch to the back window and then to the petitioner's house. (*Id*. at 97; 100.)

he was the fourth or fifth officer to arrive on the scene. (*Id*. at 128.) He testified he was radioed when the bloodhound reached the petitioner's house following the second trail. (*Id*. at 123.) He testified he was familiar with the petitioner and his family and so he handled the situation. (Return Attach. # 7 App. Pt. 2 at 126.) He stated that he knocked on the door and the petitioner's father answered the door. (*Id*.) He testified he went into the petitioner's bedroom and the petitioner was laying in bed and he told the petitioner that he needed to get dressed and go to the police department for questioning. (*Id*.) He testified the petitioner was cooperative and accompanied him to the police station. He testified that prior to going to the police station, the two parked near the crime scene for approximately thirty minutes while Solomon waited for his supervisor to tell him whether he should take the petitioner back to the police station for questioning. (*Id*. at 129.) Solomon testified that the petitioner did not seem anxious, irritable, or scared. (App. 132.) He testified the petitioner stated he had been at the Rose Bowl earlier. (App. 129; 133.) He testified that the petitioner did not admit he knew anything about the crime - not even after being given his *Miranda* warnings. (*Id*. at 133.)

The defense consisted of the petitioner's testimony and the testimony of his sister and his mother. The petitioner denied breaking into the victim's house. (Return Attach. # 7 App. Pt. 2 at 160.) The petitioner testified that he is six foot five, weighs 186 pounds, and wears a size thirteen or fourteen shoe. (*Id*. at 154.) The petitioner also testified about his past convictions: possession of crack cocaine, breach of trust, forgery, and shoplifting. (*Id*. at 159.)

The petitioner testified that late Friday afternoon his father asked him to go the McGraw's house and pay his father's lodge dues. (Id. at 146.) The McGraws lived two blocks from the petitioner. (*Id*.) He testified that as he was leaving the McGraw's house, he saw a friend on the adjacent street. (Return Attach. # 7 App. Pt. 2 at 147-148; 157; 161.)

7

He testified that he tried to catch up to his friend, but he could not and he returned home. (*Id*. at 149.)  He testified that he walked in between the victim's house and her next door neighbor.  (*Id*. at 151-152.)  The petitioner testified he stayed home until it was dark and then he went to The Shed for a while and later he walked to the Rose Bowl.  (*Id*. at 150-151; 158-159.)

The petitioner testified he spoke with Chauncy Solomon and was cooperative. (Return Attach. # 7 App. Pt. 2 at 162; 163.)  He testified that he did not tell the police about having been near the victim's house the evening before and the police did not ask him either.  (*Id*. 162.)

The petitioner's mother, Lilly Bell Williams, testified that her husband, who had since died, had asked the petitioner to pay his lodge dues on that Friday.  (*Id*. at 166.)   She testified that her daughter, who lived next door, had called her that Saturday morning and let her know that the police were around her house.  (*Id*. at 168; 169.)

The petitioner's sister, Lillie Mae Roberts, also testified for the defense.  (Return Attach. # 7 App. Pt. 2  at 171-175.) She testified that she lives next door to her parents and she gets up at 5:00 a.m. everyday to get ready for work.  (*Id*. 172.) She testified that on that Saturday morning, as she was getting ready, she heard a bell ringing outside.  She opened her kitchen door and a police officer shone his light at her and asked for the petitioner.  (*Id*. at 173.) She testified that she told him that the petitioner lived next door and he said they would circle the dog around the house where she had told them that the petitioner lived. (*Id*. 173-174.)

### III.  APPLICABLE LAW

**A.  Summary Judgment Standard**

Rule 56 of the Federal Rule of Civil Procedure states as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law.  As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings.  Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue.  *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the petitioner's position is insufficient to withstand the summary judgment motion.  *Anderson,* 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion.  *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985).

9

## B. HABEAS STANDARD OF REVIEW

Since the petitioner filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of his claims is governed by 28 U.S.C. § 2254(d), as amended. *Lindh v. Murphy*, 521 U.S. 320 (1997); *Breard v. Pruett*, 134 F.3d 615 (4th Cir.1998). Under the AEDPA, federal courts may not grant habeas corpus relief unless the underlying state adjudication:

> 1. resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States; or
>
> 2. resulted in a decision that was based on an unreasonable application of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d)(1)(2).

Federal habeas corpus relief may not be granted unless the relevant state-court adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings," 28 U.S.C.A. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 398 (2000). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 410.

## C. EXHAUSTION AND PROCEDURAL BAR

Exhaustion and procedural bypass are separate theories which operate in a similar manner to require a habeas petitioner to first submit his claims for relief to the state courts. The two theories rely on the same rationale. The general rule is that a petitioner must present his claim to the highest state court with authority to decide the issue before the federal court will consider the claim.

10

i. Exhaustion

The theory of exhaustion is based on the statute giving the federal court jurisdiction of habeas petitions. Applications for writs of habeas corpus are governed by 28 U.S.C. § 2254 , which allows relief when a person "is in custody in violation of the Constitution or laws or treaties of the United States." The statute states in part:

> (b) (1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court, shall not be granted unless it appears that
>
> > (A) the applicant has exhausted the remedies available in the courts of the State; or
> >
> > (B) (I) there is either an absence of available State corrective process; or
> >
> > (ii) circumstances exist that render such process, ineffective to protect the rights of the applicant.
>
> (2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.
>
> (3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.
>
> (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

This statute clearly requires that an applicant pursue any and all opportunities in the state courts before seeking relief in the federal court. When subsections (b) and (c) are read in conjunction, it is clear that § 2254 requires a petitioner to present any claim he has to the state courts before he can proceed on the claim in this court. The United States Supreme Court has consistently enforced the exhaustion requirement.

11

In South Carolina, a person in custody has two primary means of attacking the validity of his conviction. The first avenue is through a direct appeal and, pursuant to state law, he is required to state all his grounds in that appeal.  SCAR 207; *Blakeley v. Rabon*, 221 S.E.2d 767 (S.C. 1976). The second avenue of relief is by filing an application for PCR. S.C. Code Ann. § 17-27-10 et seq.  A PCR applicant is also required to state all of his grounds for relief in his application. S.C. Code Ann. § 17-27-90.  Strict time deadlines govern direct appeal and the filing of a PCR in the South Carolina Courts.  A PCR must be filed within one year of judgment, or if there is an appeal, within one year of the appellate court decision. S.C. Code Ann. § 17-27-45.

When the petition for habeas relief is filed in the federal court, a petitioner may present only those issues which were presented to the South Carolina Supreme Court through direct appeal or through an appeal from the denial of the PCR application, whether or not the Supreme Court actually reached the merits of the claim. If any avenue of state relief is still available, the petitioner must proceed through the state courts before requesting a writ of habeas corpus in the federal courts.  *Patterson v. Leeke*, 556 F.2d 1168 (4th Cir. 1977); *Richardson v. Turner*, 716 F.2d 1059 (4th Cir. 1983).

ii. Procedural bypass

Procedural bypass is the doctrine applied when the person seeking relief failed to raise the claim at the appropriate time in state court and has no further means of bringing that issue before the state courts. If this occurs, the person is procedurally barred from raising the issue in his federal habeas petition. The United States Supreme Court has clearly stated that the procedural bypass of a constitutional claim in earlier state proceedings forecloses consideration by the federal courts, *Smith v. Murray*, 477 U.S. 527, 533 (1986).  Bypass can occur at any level of the state proceedings, if a state has procedural rules which bar its courts from considering claims not raised in a timely fashion.

12

The two routes of appeal in South Carolina are described above, (i.e., direct appeal, appeal from PCR denial) and the South Carolina Supreme Court will refuse to consider claims raised in a second appeal which could have been raised at an earlier time. Further, if a prisoner has failed to file a direct appeal or a PCR and the deadlines for filing have passed, he is barred from proceeding in state court.

If the state courts have applied a procedural bar to a claim because of an earlier default in the state courts, the federal court honors that bar. State procedural rules promote . . . not only the accuracy and efficiency of judicial decisions, but also the finality of those decisions, by forcing the defendant to litigate all of his claims together, as quickly after trial as the docket will allow, and while the attention of the appellate court is focused on his case. *Reed v. Ross*, 468 U.S. 1, 10-11 (1984).

Stated simply, if a federal habeas petitioner can show (1) cause for his failure to raise the claim in the state courts, and (2) actual prejudice resulting from the failure, a procedural bar can be ignored and the federal court may consider the claim. Where a petitioner has failed to comply with state procedural requirements and cannot make the required showing of cause and prejudice, the federal courts generally decline to hear the claim. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

iii. Inter-relation of Exhaustion and Procedural Bypass

As a practical matter, if a petitioner before this court has failed to raise a claim in state court, and is precluded by state rules from returning to state court to raise the issue, he has procedurally bypassed his opportunity for relief in the state courts and in federal court. A federal court is barred from considering the filed claim (absent a showing of cause and actual prejudice). In such an instance, the exhaustion requirement is technically met and the rules of procedural bar apply. *Matthews v. Evatt*, 105 F.3d 907 (4th Cir. 1997)(citing

*Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1991); *Teague v. Lane*, 489 U.S. 288,297-98 (1989); and *George v. Angelone*, 100 F.3d 353,363 (4th Cir. 1996).

iv. Cause and Actual Prejudice

The requirement of exhaustion is not jurisdictional and this court may consider claims which have not been presented to the South Carolina Supreme Court in limited circumstances. *Granberry v. Greer*, 481 U.S. 129, 131 (1987). In order to have such claims considered, a petitioner must show sufficient cause for failure to raise the claim and actual prejudice resulting from the failure, *Coleman*, 501 U.S. at 750, or that a "fundamental miscarriage of justice" has occurred. *Murray*, 477 U.S. 478. A petitioner may prove cause if he can demonstrate ineffective assistance of counsel relating to the default, show an external factor which hindered compliance with the state procedural rule, or demonstrate the novelty of a particular claim. *Id.*

Absent a showing of "cause," the court is not required to consider "actual prejudice." *Turner v. Jabe*, 58 F.3d 924 (4th Cir. 1995). However, if a petitioner demonstrates sufficient cause, he must also show actual prejudice in order to excuse a default. *Murray*, 477 U.S. at 492. To show actual prejudice, the petitioner must demonstrate more than plain error. He is required to prove that specific errors infected the trial and were of constitutional dimensions. *United States v. Frady*, 456 U.S. 152 (1982).

## IV. <u>DISCUSSION</u>

### A. GROUND ONE

In Ground One, the petitioner contends that trial counsel was ineffective because she failed to object to the solicitor's first improper comment on the petitioner's right to remain silent and the solicitor's improper comments during closing arguments. Specifically, the petitioner alleges that the solicitor improperly commented on his right to remain silent and his prior record in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976). The petitioner alleges

14

that trial counsel should have objected and moved for a curative instruction or a mistrial based on these *Doyle* violations. The petitioner raised these issues in his PCR application and on appeal of the denial of PCR.

In denying the petitioner PCR, the PCR judge relied on the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court of the United States established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance. The first prong of the test requires that petitioner demonstrate that trial counsel's performance was deficient and "fell below an objective standard of reasonableness." *Id.* at 688. The second prong requires the petitioner to show that the deficient performance prejudiced the defense. *Id.* at 687.

In order to satisfy the prejudice requirement of the two-prong test set forth in *Strickland,* the Court must decide whether the petitioner has established "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." The focus is upon "the 'fundamental fairness of the proceeding.'" *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (prejudice prong focuses on "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair"). A "reasonable probability" is therefore "one 'sufficient to undermine the confidence in the outcome.' " *Strickland*, 466 U.S. at 694. The petitioner must show "that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687; *see also Lockhart*, 506 U.S. at 372 ("[u]nreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitled him").

15

Although the PCR Court determined that trial counsel's performance was deficient, the court denied the petitioner PCR because he held that the petitioner had not shown any prejudice from trial counsel's errors.

At trial, the solicitor cross-examined the petitioner without objection as follows:

Q:  And you cooperated, didn't you?

A.  Yes, I did.

Q: About what time of the morning was this, do you recall?

A:  My father was up, so it had to be after 5:00 o'clock.

Q:  Now, when you talked to Chauncy Solomon, who at that time was with the Estelle Police Department, did you tell them the reason why, or tell them that you went through that house, or that area? You didn't, did you?

A:  No. They didn't ask me either.

Q:  In fact, you didn't mention that until today, is that right?

A:  I spoke to my attorney about it.

Solicitor:  I have no further questions of this witness.

(Return Attach. # 7 App. Pt. 2 at 162.)  Immediately after, on re-direct, trial counsel asked the petitioner:

Q:  Verdell, if – if Mr. Solomon would have asked you had you gone through that neighborhood at all that day, what would you have said?

A: I would have told him the same thing I just told the Solicitor.

(*Id*.)

Shortly after, the following occurred during the solicitor's cross-examination of the petitioner:

Solicitor:  Isn't it true, in fact, the officers did ask you to make a statement and you refused?

Trial Counsel Plexico:  Object. Object. Object. A matter of law.

16

> Trial Counsel Smart:  I object He does not have to make a statement.
>
> The Court:  He doesn't have to.  Yes, ma'am.
>
> Solicitor:  No further questions.
>
> The Court:  You can step down.
>
> Trial Counsel Plexico:  It's a matter of law.
>
> Trial Counsel Smart:  Uh, your Honor, I'd have a matter of law I'd like to take up out of the presence of the jury.
>
> The Court:  Well, do it during the next break.  He doesn't have to make any statement.  The question was improper.  Just forget he asked the question.  The Solicitor knows better than to ask the question.  If they ask questions, he can answer or not.  That's his constitutional right.  Okay?
>
> Trial Counsel Smart:  Um the defense would call Ms. Lilly Bell Williams.
>
> The Court:  Jurors, while she's coming up, uh any time a witness testifies, the State may bring out the fact that they have a prior record.  Okay?  That's just brought out for you to consider.  If you feel it somehow impacts on the witnesses (sic) credibility – it's not admitted to show that they may have a propensity to commit crime or anything like that.  It's just admitted to show that – your's entitled to know the whole facts about a person.  You follow me?

(*Id*. at 164-165.)  After the defense rested, trial counsel moved for a mistrial based on the solicitor's comments that the petitioner did not give a statement to the police.  (*Id*. at 176.) Trial counsel argued that the curative instruction would not cure the error.  (*Id*.)  The trial judge denied the mistrial motion.  (*Id*.)

The denial of that motion for a mistrial was the basis for the petitioner's direct appeal. The petitioner argued that the trial court erred in failing to grant his motion for a mistrial.  In an unpublished opinion, the South Carolina Court of Appeals found that the comment was impermissible but constituted harmless error because the reference to the petitioner's silence was limited to one isolated instance, the reference was not directly related to the

petitioner's exculpatory story, and the evidence against the petitioner was overwhelming. (Return Attach. # 10 - S.C. Ct. of Appeals' Op. at 6-7.) Alternatively, the court found the evidence was cumulative to prior testimony. (*Id.*) Additionally, the court held that any prejudice resulting from the solicitor's improper questioning was cured by the trial court's instruction to disregard the question. (*Id.*)

In finding the evidence of the petitioner's guilt was overwhelming, the South Carolina Court of Appeals stated: "specifically he fit the description given by [the victim], his shoe print found was found at the scene of the crime, and the bloodhound followed his scent from [the victim's] back door all the way to his home." (Return Attach. # 10 - S.C. Ct. of Appeals Op. at 7.) The PCR court stated at the PCR hearing that the South Carolina Court of Appeals had held the evidence of guilt was overwhelming, but that he was not sure he agreed with that. (Return Attach. # - PCR Tr. at 46-47.) He further stated it was "impossible" for him to find prejudice because of the Court of Appeals' decision that the evidence of guilt was overwhelming. (*Id.* at 47.)

The petitioner also complains about the following comments made by the solicitor in his closing argument:

> Verdell Williams, here's a man, a convicted felon. He's done time. He knows the system. This crime happened three months ago, approximately three months ago, and we're already in court today. He's had all that time. He knows he was there. His footprint was found at the scene, so what does he have to do? He has to make a story that will fit the facts, and I'm going to talk to you about that story.

(Return Attach. # 7 App. Pt. 2 at 194.)

The PCR judge found that counsel was deficient for failing to object to the solicitor's comments in the closing argument. The PCR judge found that the questions and comments were clearly improper and trial counsel was deficient for failing to object. (Return Attach. # 13 - PCR Order 4-5.) Again, however, as discussed above, he found that the petitioner

18

failed to show any prejudice relying on the South Carolina Court of Appeals' decision on the petitioner's direct appeal.  (*Id*. at 5.)

Such a cursory analysis, i.e. relying solely on the South Carolina Court of Appeals' opinion even when it appears the PCR judge disagreed as to whether there was prejudice, presents problems for a federal court attempting to determine whether the PCR court unreasonably applied *Strickland's* prejudice prong to the facts of the petitioner's case. Nonetheless, "a summary state court decision on the merits of a federal constitutional claim is an 'adjudication' of the claim for purposes of § 2254(d)." *Bell v. Jarvis*, 236 F.3d 149, 163 (4th Cir. 2000).  The federal habeas court cannot proceed to a de novo review of the state court's decision simply because the latter provided no reasoning; rather, it is the federal court's responsibility to conduct an independent review of the record and relevant federal law.  *See id.*  Section 2254(d) is satisfied if, after conducting that independent review, the federal court concludes that state court's "'result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts.'" *Id*. (Internal quotation omitted). "In assessing the reasonableness of the state court's application of federal law, the federal courts are to review the result that the state court reached, not whether the [decision was] well reasoned."  *Wilson v. Ozmint*, 352 F.3d 847, 855 (4th Cir. 2003) (internal quotation marks omitted) (alterations in original).

### 1.  Cross-Examination of the Petitioner

It is well established that the prosecution may not use a defendant's post-arrest, post-*Miranda* silence either to impeach the defendant's testimony at trial, *see Doyle*, or as evidence of guilt during the prosecution's case-in-chief, *see Wainwright v. Greenfield*, 474 U.S. 284, 292 (1986). Reference to the accused's post-*Miranda* silence usually is impermissible because it is fundamentally unfair for the government to induce silence

19

through *Miranda* warnings and then to later use that silence against the accused. See *Doyle*, 426 U.S. at 617-18

The respondent contends the error was an invited error because the petitioner's trial counsel had pursued the line of inquiry first and opened the door citing *Williams v. Zahradnick*; *United States v. Daniels*, 617 F.2d 146 (5th Cir. 1980) (where defendant in argument asserted his cooperation with police, he opened door for prosecutor to argue that defendant had not cooperated for four years); *State v. Brinkley,* 888 P.2d 819 (Kan. 1995) (where defense counsel brought up defendant's post-arrest silence during direct examination, and defense counsel in argument used silence to support the defendant's credibility, defendant opened the door for state to explore defendant's post-arrest conduct and to respond to defendant's attempt to use his silence to his favor); and *State v. Vargas,* 610 P.2d 1 (Wash. Ct. App. 1980) (holding where defendant testified earlier that he cooperated and gave statement to police, cross-examination of officer on fact that defendant did give a statement was permissible, as defense opened the door to full exploration of the defendant's post-arrest conduct).

The respondent contends that the petitioner opened the door during trial counsel's cross-examination of Deputy Solomon when she asked him whether the petitioner had given any statements:

> Q: Okay. But he didn't make any – at any time did he admit that he knew anything about what was going on?
>
> A: No, not even when we got him to the office, um we Miranda – we gave him his Miranda warnings, what have you, and he refused to give a statement. He said he didn't know nothing about it.
>
> Q: So he has always said from the beginning that he didn't know anything about it?
>
> A: Of course he said that.
>
> Q: And he has never given a statement saying that?

A:  He didn't give no statements. He – he, you know, he didn't know nothing. He said he don't know nothing.

Q: Okay. Thank you. No further questions.

(Return Attach. # 7 App. Pt. 2 at 133-34.)

As noted above, the petitioner must demonstrate that trial counsel's performance was deficient and the deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair.  *Strickland*, 466 U.S. at 694; *Lockhart*, 506 U.S. at 372. As the South Carolina Court of Appeals correctly noted, trial counsel opened the door for the solicitor's questions through her earlier cross-examination of Detective Soloman.  A defendant is not entitled to relief based upon an error he invited.  *See United States v. Reyes-Alvarado,* 963 F.2d 1184, 1187 (9th Cir.1992); *United States v. Boyd*, 86 F.3d 719, 722 (7th Cir. 1996).  "Thus, while comment on a defendant's silence is usually improper, such comment may be permissible when the defendant, by the impression he has sought to create, has opened the door."  *United States v. Matthews*, 20 F.3d 538, 552 (2d Cir. 1994).

Furthermore, in *United States v. Fairchild*, 505 F.2d 1378, 1383 (5th Cir. 1975), the court held that a prosecutor may question a defendant about his post-arrest silence for the purpose of rebutting the impression that he cooperated with law enforcement authorities.[5] Reviewing the trial transcript, it appears that the solicitor's inquiry into the petitioner's failure to give a statement was for the purpose of rebutting his claim that cooperated with the police.  "When a defendant attempts to convince a jury that he was of a cooperative spirit, *Doyle* does not tie the hands of prosecutors who attempt to rebut this presentation by pointing to a lack of cooperation."  *United State v. Reveles*, 190 F.3d 678 (5th Cir. 1999).

---

[5]While *Fairchild* was decided prior to *Doyle,* the Fifth Circuit later specifically stated in *Chapman v. United States*, 547 F.2d 1240, 1243 n. 6 (5th Cir.1977), that *Fairchild* "clearly survive[s] *Doyle*."

The prohibition against reference to post-arrest silence does not allow the defendant to "freely and falsely create the impression that he has cooperated with police when, in fact, he has not." *Earnest v. Dorsey*, 87 F.3d 1123, 1135 (10th Cir. 1996) (*quoting Fairchild*, 505 F.2d at 1383). Reference to post-arrest silence is permissible for rebuttal purposes when defendant implies that he cooperated with the police. *Id*. *See also United States v. Shue,* 766 F.2d 1122, 1130 (7th Cir.1985); *United States v. Gant*, 17 F.3d 935, 941-42 (7th Cir.1994); *McMillan v. Gomez,* 19 F.3d 465, 469-70 (9th Cir.1994); *Grieco v. Hall*, 641 F.2d 1029, 1033 (1st Cir.1981).

Furthermore, arguably, here, the petitioner, unlike the defendants in *Doyle*, did not remain silent when questioned by the police. Instead, after receiving his *Miranda* warning, the petitioner stated that he did not know anything about the crime and at trial he testified that he was cooperating with the police. This was clearly an affirmative answer, rather than silence. Therefore, nothing in *Doyle* would preclude the prosecution from questioning the petitioner about his prior affirmative statement. *Anderson v. Charles*, 447 U.S. 404, 408 (1980)(*Doyle* does not apply in situations where "a defendant . . . voluntarily speaks after receiving *Miranda* warnings [because he] has not been induced to remain silent."). In *United States v. Mavrick,* 601 F.2d 921 (7th Cir. 1979), for example, the court ruled that prosecutorial questioning regarding the defendant's failure to explain his illegal conduct to authorities upon arrest was not error since the defendant himself had, on direct examination, implied that given the opportunity, he would have explained. The Court in *Mavrick* analogized its ruling to a line of cases which allow the government to use a defendant's post-arrest silence to rebut the inference created by the defense that the defendant had fully and actively cooperated with law enforcement authorities.

In the second colloquy, to which trial counsel objected, the solicitor may arguably have gone beyond impeaching the defendant's testimony regarding his post-arrest conduct,

which is proper, and instead improperly have argued that the defendant's silence was inconsistent with his claim of innocence. *See United States v. Shue,* 766 F.2d at 1128-29 (government argued that defendant "refused to talk to the FBI, refused. And no one ever heard of this preposterous, incredible story of a frame until he hit the witness stand.") However, at this point, trial counsel objected and a curative instruction was given.

The petitioner's claim must fail, however, because he fails to demonstrate that had trial counsel objected to the these questions, there is a reasonable probability that the results of the proceeding would have been different.

### 2. Comments During Closing Arguments

If no improper closing argument exists, then trial counsel cannot have given ineffective assistance of counsel by failing to object to it; the undersigned therefore begins by looking at whether prosecutorial misconduct exists. *See Moore v. U.S. (Moore I)*, 934 F.Supp. 724, 727 (E.D.Va. 1996) ("Because the trigger for an ineffective assistance claim is an unprofessional error or mistake by counsel, the Strickland analysis of the claim properly begins with the identification of the error or mistake.").

Improper remarks during a closing argument to the jury deny due process only if they so infect the trial with unfairness that reversal is required. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *United States v. Harrison*, 716 F.2d 1050, 1051 (4th Cir. 1983). In analyzing "a due process claim premised on unfair prosecutorial conduct, the court is to examine several factors, including "the nature of the prosecutorial misconduct, the extent of the improper conduct, the issuance of curative instructions from the court, any defense conduct inviting the improper prosecutorial response, and the weight of the evidence." *Humphries v. Ozmint*, 397 F.3d 206, 218 (4th Cir. 2005).

These factors are examined in the context of the entire trial, and no one factor is dispositive. *Donnelly v. DeChristoforo*, 416 U.S. 637, 639 (1974). The standard in *Donnelly*

is a very high standard for a defendant to meet. " '[I]t is not enough that the remarks were undesirable or even universally condemned.' " *Darden,* 699 F.2d at 1036.  Furthermore, "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly*, 416 U.S. at 647.

The conduct challenged in this case is the solicitor's isolated comments in his closing argument statements that the petitioner was an ex-felon and knew the system.  Here, the jury was aware, by previously admitted testimony, that the petitioner was a convicted felon. *See Misner v. Quarterman*, 2008 WL 2465351 * 19 n.7 (W.D. Tex. 2008)(in closing argument of the sentencing phase, the prosecutor's reference to the defendant's 50-year crime spree did not violate *Doyle* in light of the fact that the defendant had 11 felony convictions dating back to 1955 and thus, the argument was supported by the evidence.) Further, the trial judge explicitly cautioned the jury twice against considering evidence of other wrongs or crimes in deciding the petitioner's guilt.  (App. 165, 204.)

Moreover, the record suggests that defense counsel's conduct invited the prosecutor to make the comments.  It is well-settled that, when the defense makes comments in closing that invite the government to respond, the prosecution, in rebuttal, may enter into areas which otherwise would constitute improper argument. *United States v. McNatt*, 931 F.2d 251, 258 (4th Cir.1991) (concluding the prosecution was entitled to respond to the defendant's argument that the police officer had planted the drugs); *United States v. Harrison*, 716 F.2d 1050, 1052-53 (4th Cir. 1983).  Therefore, before addressing the prosecutor's purportedly improper comments, it is necessary briefly to recount the defense's closing argument.

In her closing arguments, trial counsel stated:

24

> I am a lawyer. They say lawyer's lie, but am I going to sit there and think, hmm, let me think of an alibi before I commit this crime tonight. Let me say that the McGraws' won't take this money, and let me take the trail that I'm going to take – that I know I'm going to take later tonight, and then let me come back and give my momma her money back and say, "Oh, they couldn't take the money," because the State is going to come back and say "Well, he had the trail, so I have an alibi. Yes, I'll do this so I can have my alibi for tonight after I go to the club and come home and go back and burglarize this lady's house.

(Return Attach. # 7 App. Pt. 2 at 191.)

As noted above, the petitioner complains about the following comments made by the solicitor in his closing argument:

> Verdell Williams, here's a man, a convicted felon. He's done time. He knows the system. This crime happened three months ago, approximately three months ago, and we're already in court today. He's had all that time. He knows he was there. His footprint was found at the scene, so what does he have to do? He has to make a story that will fit the facts, and I'm going to talk to you about that story.

(Return Attach. # 7 App. Pt. 2 at 194.) During the PCR hearing, the PCR judge noted that after reading the entire paragraph, "it does follow a train into an argument about credibility. The argument is basically that he knows the system, he knows that he's got to fabricate a story and that he  – and then he knows – the very last sentence of the paragraph is that "he has to make a story that will fit the facts." (Return Attach. # 15 - PCR Tr. at 47-48.) Arguably, the solicitor's comments were not even improper; but rather were an invited response to the trial counsels' closing argument.

As to the weight of the evidence, the undersigned is not convinced that the evidence of the petitioner's guilt was overwhelming. First, the undersigned notes that the there was no fingerprint evidence found in the victim's house and the victim specifically testified that she could not identify the perpetrator. She testified only that he was a tall, dark-skinned black man.

25

The shoe print found was consistent with the petitioner's shoes. However, the undersigned notes that the shoe print was not technically found at the crime scene; it was discovered on the victim's neighbor's property in a carport. Furthermore, as to the dog tracking the scent to the petitioner's home, the undersigned notes that many jurisdictions regard dog tracking evidence alone as legally insufficient and require corroborating evidence to prove identification.[6] *See, e.g., People v. Gonzales*, 218 Cal.App.3d 403 (1990) ("a conviction cannot rest on dog tracking evidence alone"); *People v. Stone*, 491 N.W.2d 628, 630 (Mich. App. 1992) ("Tracking-dog evidence is admissible only after certain foundational requirements are met. In addition, there must be other corroborating evidence presented before identification based on tracking-dog evidence is sufficient to support a guilty verdict."); *State v. Loucks*, 656 P.2d 480, 482 (Wash. 1983) ("The dangers inherent in the use of dog tracking evidence can only be alleviated by the presence of corroborating evidence identifying the accused as the perpetrator of the crime."). While dog tracking evidence is recognized in South Carolina, *State v. White,* 642 S.E.2d 607 (S.C.App. 2007), the South Carolina appellate courts have not addressed whether corroborating evidence is necessary for its admission.

The undersigned does not believe that the shoe print which was consistent with the petitioner's shoe found in the neighbor's carport would be sufficient corroborating evidence nor would the victim's general description of the perpetrator as a tall dark skinned black

---

[6]Several jurisdictions find dog tracking evidence inadmissible under any circumstances. *See People v. McDonald*, 749 N.E.2d 1066 (Ill. App. 2001); *Brafford v. State,* 516 N.E.2d 45 (Ind.1987); *State v. Storm,* 238 P.2d 1161 (Mont. 1951); *Brott v. State,* 97 N.W. 593 (Neb. 1903). These courts object to dog tracking evidence on the following grounds: 1) the actions of the bloodhounds are unreliable; 2) the evidence constitutes hearsay; 3) the defendant is deprived of his constitutional right to confront the witnesses against him; 4) the defendant should not be placed in jeopardy by the actions of an animal; 5) a defendant cannot cross-examine the dogs; and 6) a jury might be awed by such testimony and give it much greater weight and importance than warranted. *People v. Centolella,* 305 N.Y.S.2d 279, 281-82 (N.Y.Co.Ct.1969).

man.  In sum, the undersigned is not convinced that the evidence of the petitioner's guilt was overwhelming.   However, that is not to say that there was not sufficient evidence for the jury to find him guilty.[7]

After a thorough review of the closing arguments and considering all of the appropriate factors and keeping in mind that no one factor is dispositive, *Donnelly,* 416 U.S. 639, the undersigned is unable to find that these comments were so improper that counsel's failure to raise an objection amounted to deficient performance.  The comment was isolated and made in the context of a rebuttal to trial counsel's closing argument.  Further, the trial court instructed the jury regarding the petitioner's prior criminal record and its proper use.

Closing arguments are adversarial in nature and while the Fourth Circuit has cautioned against certain statements by prosecutors, nothing in these closing remarks approaches what the Fourth Circuit describes as the outer limits of proper argument. *See e.g. United States v. Moore,* 710 F.2d 157, 159 (4th Cir.1983) (commenting on prosecutor's statement that a defense witness insulted the jury by telling the most incredible lies); *United States v. Rogers*, 853 F.2d 249, 251 and 253 (4th Cir.1988) (remarking that prosecutor's reference to defendant as a liar, thief and crook, while excessive and uncalled for, was harmless overkill and not plain error).  Furthermore, trial counsel may have believed that it is "better to remain silent than to draw attention to a matter by offering an objection" *Moore I,* 934 F.Supp. at 727, to this isolated comment which arguably was a rebuttal to trial counsel's closing argument.[8]  In fact, the Fourth Circuit has stated that whether trial counsel

---

[7]When reviewing a sufficiency of the evidence claim, the jury's verdict will be sustained "if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80 (1942). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir.1996)

[8]Trial counsel stated she did not recall why she did not object.  (Return Attach. # 15 - PCR Tr. at 30.)

27

"simply didn't think to object or deliberately did not object" does not matter. *Inge v. Procunier*, 758 F.2d 1010, 1016 (4th Cir.1985). Thus, the undersigned also concludes trial counsel's failure to object was a reasonable trial tactic, falling within a standard of reasonable objectiveness.

## B. Ground Two

In Ground Two, the petitioner alleges that trial counsel was ineffective for failing to move to suppress the admission of a pair of his tennis shoes. Trial counsel stipulated that the shoes could be introduced as evidence. (Return Attach. # 7 App. Pt. 2 at 285; 291; 299.)[9] The shoes were seized from the petitioner's mother's home where the petitioner was living. The petitioner contends the seizure of the shoes violated his Fourth Amendment rights because the police did not have probable cause or obtain the proper consent.

The PCR court held that trial counsel had testified that it was part of her theory that the petitioner was near the victim's house during the day of the crime and a shoe print of the petitioner's would not deviate from that defense. (Return Attach. # 13 - PCR Order at 6.) The PCR Court also held that the petitioner failed to establish any prejudice because there was no reasonable likelihood that had trial counsel made a motion to suppress, the outcome would have been different. (*Id*.) The PCR Court noted that the officers were lawfully in the house and, in any event, the shoes would have been discovered and seized at some point. (*Id*.)

At the PCR hearing, trial counsel testified that her defense was that the petitioner had been near the scene of the crime sometime earlier during that day. Therefore, a shoe print near the victim's neighbor's carport which matched the petitioner's shoes did not deviate from her theory of the case in any way. (Return Attach. #  - PCR Tr. 22; 25.)

---

[9]The shoes were marked as Exhibit # 3 (Return Attach. # 7 App. Pt. 1 at 66; 77) and were subsequently moved into evidence without objection. (*Id*. 80.)

At trial, Officer Jordan Jinks of the Hampton County Sheriff's Office testified that the petitioner had already left with law enforcement officers at the time of the search. He testified that the petitioner's sister told officers "whatever we needed to do, we could do. The sister then escorted us to the kitchen where we started, and I found the shoes underneath the kitchen table." (Return Attach. # 7 App. Pt. 1 at 66-68.) The officers were lawfully in the house at the time that the tennis shoes were seized with the consent of the petitioner's sister and without objection from a present co-occupant. *See Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006) (holding "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant").

Further, the officers had probable cause. The description of the assailant was a "very tall" black man and the shoe print was from a very large shoe, size fourteen. The petitioner testified that he is six foot five and wears a size thirteen or fourteen shoe. (*Id*. at 154.) Additionally, even if they did not have probable cause to seize the shoes at that time, the shoes inevitably would have been discovered. Evidence derived from unlawful searches is generally subject to suppression. *Wong Sun v. United States*, 371 U.S. 471, 484-87 (1963). The rule of inevitable discovery provides for an exception to the exclusionary rule where "the prosecution can show by a preponderance of the evidence that the government would have discovered the challenged evidence even had the constitutional violation to which the defendant objects never occurred." *Nix v. Williams*, 467 U.S. 431, 440-48 (1984). In the Fourth Circuit, "the premise of the inevitable discovery doctrine is that the illegal search played no real part in discovery of incriminating evidence. Only then, if it can be shown that the taint did not extend to the second search, would the product of the second search be admissible." *United States v. Whitehorn*, 813 F.2d 646, 650 n. 4 (4th Cir.1987)

The record here establishes that the discovery inevitably arose from circumstances other than those disclosed by the alleged illegal search. In other words, here the inevitable discovery arose not from searching the house, but rather from the discovery of the footprint. The footprint was discovered and documented at some point that evening while the petitioner was in custody. Undoubtedly the police officers would have returned to the petitioner's home and seized the shoes, at which point there is no reasonable argument that probable cause did not exist. The shoes, therefore, would have been discovered and seized at some point during the evening of the petitioner's arrest.

As a result, the PCR judge did not unreasonably apply *Strickland* when he found that there was neither deficient performance nor resulting prejudice. Trial counsel did not have a reasonable basis upon which to successfully argue that the shoes should be suppressed. Therefore, trial counsel's performance did not fall below the required standard of reasonableness and no prejudice resulted from her decision to stipulate to the shoes, rather than move to suppress them.

## C. GROUND THREE

In Ground Three, the petitioner contends that "[t]here is absolutely no credible evidence (circumstantial or otherwise) upon which to support and sustain a judgment of conviction. Thus, Petitioner's [convictions violate] Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution."

The petitioner did not raise this issue in his direct appeal or in his PCR proceedings in state court. Therefore, the petitioner has procedurally defaulted on this claim. When a state prisoner has defaulted his claims in state court, habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will

result in a fundamental miscarriage of justice. *Coleman,* 501 U.S. at 750. The petitioner has not shown cause and prejudice as to these claims.

To the extent that the petitioner, is arguing actual innocence to excuse his procedural default, the undersigned finds this argument without merit. A petitioner may also excuse a procedural default by establishing that failure to consider the claim would result in a fundamental miscarriage of justice. A fundamental miscarriage of justice is the functional equivalent of "actual innocence." *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Weeks v. Angelone,* 176 F.3d 249, 269 n. 11 (4th Cir. 1999). Unlike a claim challenging the sufficiency of the evidence, a claim of actual innocence is not itself a constitutional claim, rather it is a "gateway through which a habeas petition must pass to have his otherwise [procedurally] barred constitutional claim considered on the merits." *Spencer v. Murray*, 5 F.3d 758, 764 (4th Cir.1993) (quoting *Herrera v. Collins,* 506 U.S. 390, 404 (1993))(internal quotations omitted). In order to demonstrate actual innocence, the petitioner must show that, if new reliable evidence were introduced, it is more likely than not that no reasonable juror would convict him. *Schlup v. Delo,* 513 U.S. 298, 324-37 (1995); *Royal v. Taylor,* 188 F.3d 239, 243-44 (4th Cir.1999). " 'To be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." *Calderon v. Thompson,* 523 U.S. 538 (1998) (*quoting Schlup,* 513 U.S. at 324. The petitioner has not offered any new evidence in support of his claim of actual innocence. He simply reiterates his arguments concerning the sufficiency of the evidence presented at trial. Since the petitioner has not demonstrated cause for his default nor actual innocence, this claim is procedurally defaulted.

In *Kornahrens v. Evatt*, 66 F.3d 1350 (4th Cir. 1995), the Court of Appeals stated that once a claim is determined to be procedurally barred, the court should not consider the issue on its merits. The Court noted that it is always tempting to discuss the merits as an alternative reason for a conclusion, but once a court finds an issue to be procedurally

31

barred, all discussion which follows is only dicta.  *See Karsten v. Kaiser Foundation Health Plan*, 36 F.3d 8, 11 (4th Cir. 1993).  Therefore, once a court has determined that a claim is procedurally barred, it should not stray into other considerations.  Accordingly, the undersigned will not discuss the merits of Grounds Three as this ground is procedurally barred.

## V.  CONCLUSION

Wherefore, based on the foregoing, it is RECOMMENDED that the Respondent's Motion for Summary Judgment (#15) be GRANTED.

IT IS SO RECOMMENDED.


s/Bruce Howe Hendricks
United States Magistrate Judge

February 17, 2009
Greenville, South Carolina


**The petitioner's attention is directed to the important notice on the next page.**

32

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail. Fed. R. Civ. P. 6(a) & (e). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
P.O. Box 10768
Greenville, South Carolina 29603

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).